```
                   IN THE UNITED STATES DISTRICT COURT

                       FOR THE DISTRICT OF ARIZONA

RODNEY E. GRAVATT, a married man,  )
                                   )
                   Plaintiff,      ) NO.  CV 98-2166-PHX-ROS-OMP
                                   )
    v.                             )
                                   )
PAUL REVERE LIFE INSURANCE         ) OPINION
COMPANY, a corporation,            )
                                   )
                   Defendant.      )


CALVIN C. THUR
HOWARD L. ANDARI
Thur & O'Sullivan, P.C.
8170 N. 86th Place, Suite 100
Scottsdale, AZ 85258

     Attorneys for Plaintiff

JOSÉ A. CARDENAS
STEPHEN M. BRESSLER
THOMAS KINKEL
Lewis & Roca LLP
40 North Central Avenue
Phoenix, AZ 85004-4429

     Attorneys for Defendant Paul Revere
     Life Insurance Company
```

1  - OPINION

**PANNER, J.**

Plaintiff Rodney E. Gravatt brings this action under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461, claiming that defendant Paul Revere Life Insurance Co., improperly denied long-term disability benefits. On de novo review of defendant's denial of benefits, I conclude that defendant was correct.

## BACKGROUND

In February 1987, defendant issued plaintiff a disability policy. Plaintiff was a vice-president and manager in his family's plumbing business, Reddi Root-R, Inc., which was based in Kansas City, Kansas.

In March 1987, plaintiff went to a hospital emergency room in Shawnee Mission, Kansas, complaining of dizziness. He mentioned that he suffered from similar episodes since January 1987. After ruling out cardiac disease, the attending physician diagnosed panic attacks.

In March 1988, plaintiff again went to a hospital emergency room, complaining of chest pain. Plaintiff was diagnosed as suffering from panic attack disorder.

Plaintiff later moved to Arizona to open a branch of the family plumbing business.

In 1990, when plaintiff was thirty years old, he sought benefits from defendant for total disability as of June 1990,

2 - OPINION

based on panic attacks.  To support his claim, plaintiff asked his family physician, David Bryman, an osteopath, to submit an Attending Physician Statement to defendant.  Dr. Bryman stated that plaintiff was disabled by "severe anxiety and panic attacks."

At the same time he was seeking total disability benefits from defendant, plaintiff claimed that Reddi Root-R, his family's business, was liable to him for causing "personal injuries" (the anxiety attacks).  Effective July 31, 1990, plaintiff entered into a settlement agreement with Reddi Root-R.  Reddi Root-R agreed to pay plaintiff $546,000 in 364 weekly installments of $1,500 each.  Reddi Root-R also agreed that if plaintiff was "still disabled on the seventh annual anniversary of the Effective Date of this Settlement Agreement [July 31, 1997], Reddi Root-R, Inc. shall pay an additional sum of $1,014,000 to [plaintiff], payable in 676 weekly installment of $1,500."  Paul Revere File (PRF), Ex. B, at 1.  It was agreed that plaintiff would be conclusively deemed disabled if he was receiving disability payments from defendant or from any government agency.  If plaintiff was not disabled as of July 1997, Reddi Root-R agreed that it would employ plaintiff as a consultant, paying him at least what he had received before becoming disabled.  Defendant learned of plaintiff's settlement agreement with Reddi Root-R through this litigation, after it had denied benefits.

3 - OPINION

I agree with defendant that plaintiff's settlement agreement with Reddi Root-R is relevant to show that plaintiff had a financial incentive to claim disability. However, as plaintiff notes, the settlement agreement also provided that plaintiff would be deemed disabled if he was receiving government disability benefits, and plaintiff apparently was receiving Social Security disability benefits as of July 31, 1997.

Defendant began paying disability benefits to plaintiff in September 1990. Plaintiff initially received about $4,500 per month. By 1995, the benefits were $5,454 per month. PRF, Ex. A, at 818.[1]

Defendant requested that plaintiff submit monthly progress reports from his attending physician. Plaintiff chose Dr. Bryman, an osteopath, to be his attending physician. Dr. Bryman's first progress report, dated October 9, 1990, described plaintiff's prognosis as "fair" and predicted that plaintiff could resume "some work" in about nine months. PRF 195.

In September 1991, defendant asked Dr. Kerwin Lebeis, a psychiatrist, to complete a psychiatric assessment form. Dr. Lebeis had seen plaintiff about four times, starting in April 1990, on a referral from plaintiff's heath insurer.

Dr. Lebeis diagnosed panic disorder, with narcissistic

---

[1] All further PRF references are to Exhibit A unless otherwise noted.

4 - OPINION

personality disorder. He found that plaintiff's Global Assessment of Functioning (GAF) scale was 65, which indicates only moderate impairment in social or occupational functioning. Plaintiff was taking Xanax to control anxiety attacks, Tenormin to lower his heart rate, and amitriptyline to help him sleep.

Dr. Lebeis stated that plaintiff "avoids stressful situations such as decision making." PRF 405. Regarding vocational rehabilitation, Dr. Lebeis reported that plaintiff was "defeatist & 'claustrophobic,'" and "needs to be pushed." Id. He found that plaintiff was "[n]ot interested in further exploration of vocational options." Id. at 406.

In February 1992, Jon Allen, a field representative for defendant, interviewed plaintiff. Plaintiff told Allen that he suffered an anxiety attack about every two days, of unpredictable intensity. Plaintiff said that two weeks before, he had an attack so severe that he was rushed to the hospital. Plaintiff stated that he saw Dr. Lebeis, the psychiatrist, only to keep prescriptions current, and not for any other treatment.

Allen also interviewed Dr. Bryman. Allen reported that when he told Dr. Bryman that the current treatment did not seem to be helping plaintiff, Dr. Bryman replied that he was "quite concerned," and had "quite frequently told [plaintiff] that he is only a family physician and he should seek treatment elsewhere. He has constantly tried to convince [plaintiff] to seek treatment

5 - OPINION

through someone who is very well educated in panic disorders." PRF 443. Dr. Bryman confirmed that plaintiff had a "severe problem" with the panic disorder.

A psychiatric consultant for defendant, Cathy Galavotti, wrote to Dr. Bryman in April 1990. In her letter to Dr. Bryman, Galavotti stated that plaintiff appeared to be "resistant to treatment focused on resolving issues of panic and/or reducing attacks. He also appears to believe that avoidance of stress is sufficient therapy. Based on this, we have trouble seeing this claim as being influenced primarily by an illness rather than by choice and/or opportunity." PRF 468. Galavotti stated that the prospect of continuing to receive disability benefits may trigger dependency in a person.

By letter dated April 20, 1990, Dr. Bryman responded to Galavotti's letter. Dr. Bryman wrote that he agreed with most of Galavotti's comments, and that he had advised plaintiff that "simple avoidance of work perhaps is not the best treatment of panic disorders." PRF 478. Dr. Bryman had been asking plaintiff to seek psychiatric treatment "since the onset of his disability," but plaintiff resisted. Id. Dr. Bryman wrote, "I truly believe [plaintiff] suffers from panic attacks and that these attacks are certainly disabling, however, I am not convinced [plaintiff] has sought out and exhausted medical and/or psychiatric therapy." Id. Dr. Bryman recommended obtaining "the

6 - OPINION

input of a psychiatrist to perhaps facilitate [plaintiff's] acquisition of gainful employment."  Id.

Galavotti asked Dr. Eugene Almer, a psychiatrist, to conduct an independent medical examination of defendant.  Galavotti told Dr. Almer that plaintiff been controlling his symptoms mainly by avoiding work, and had resisted Dr. Bryman's recommendations to seek a psychiatrist's help.  Galavotti stated that defendant hoped Dr. Almer could "help sort through some of the motivational issues preventing [plaintiff] from engaging in this activity."  PRF 501.

Plaintiff saw Dr. Almer in November 1992.  Plaintiff refused to complete the psychological tests, telling Dr. Almer that he had assumed the independent medical examination would be a physical examination taking no more than half an hour.  Dr. Almer reported that plaintiff had displayed a "manipulative, aggressive, complaining, plaintive, hostile, defensive manner."  PRF 522.  For example, plaintiff made phone calls during the examination.  He told Dr. Almer "that no psychologist or psychiatrist would ever be able to help him, that only God could do this for him."  PRF 517.  When Dr. Almer asked plaintiff about his daily activities, plaintiff "really became upset and went into a long, ventilating tirade."  PRF 518.

Plaintiff completed an MMPI test, which Dr. Almer found indicated "an extremely high hysterical scale," and high scores

7 - OPINION

for anxiety and hypochondriacal behavior. Other tests suggested "pathological exaggeration" of symptoms. PRF 522. Dr. Almer thought that plaintiff exhibited a great deal of anger and hostility. Plaintiff was "not motivated to get well" because of the benefits he received from his disability, not only the obvious monetary benefits but also the attention he received from family and friends.[2] Dr. Almer thought that plaintiff "is certainly not motivated to do anything to help himself and has the comforting rationalization[] that nobody on earth could be capable of helping him . . . ." PRF 523. Dr. Almer stated that plaintiff "needed to be told to stop playing games." Id.

Soon after Dr. Almer's examination, plaintiff met with Jon Allen, defendant's field representative, to complain about Dr. Almer. Plaintiff said that Dr. Almer had told him that he must complete the psychological testing or lose his benefits. Plaintiff said that after leaving Dr. Almer's office, he suffered several anxiety attacks, including a very severe one that night. Plaintiff had been offended by test questions about his attitudes toward sex, and he felt that Dr. Almer had treated him rudely and unfairly. Defendant notes that Dr. Almer had a good track record

---

[2]At his deposition, plaintiff described suffering a panic attack in church: "when you're standing in church and men pick you up and carry downstairs in the basement to lay you down, and . . . a dozen people circle around you to pray for you, that's embarrassing. But when you're sick, and you're having a bad anxiety attack, that's just the way it is." Dep. at 91.

8 - OPINION

in other referrals.

At plaintiff's request, defendant agreed to send plaintiff to another psychiatrist for evaluation. Defendant chose Dr. Miriam Cohen. A psychologist, Lorna Cheifetz, administered psychological tests for Dr. Cohen.

On February 16, 1993, Dr. Cheifetz examined plaintiff. She also evaluated Dr. Almer's raw test results, and disagreed with some of his conclusions. She found that plaintiff had answered test questions sincerely and had not exaggerated his symptoms. Dr. Cheifetz found that the test results showed plaintiff to be a person who would suffer from stress-caused physical ailments rather than admit emotional conflicts. She did agree with Dr. Almer that plaintiff "expects much attention from others." PRF 585.

Dr. Cheifetz diagnosed panic disorder with moderate agoraphobia, and schizotypal personality disorder with narcissistic features. She noted that plaintiff persistently maintained that no psychologist or psychiatrist could help him, and acted as though the panic attacks were biological or came out of nowhere. Dr. Cheifetz thought that plaintiff's symptoms could be resolved with proper treatment and plaintiff's cooperation. However, she found that even if plaintiff could be required to seek treatment, "based on his personality style . . . he is going to fight every effort toward looking at emotional factors related

9 - OPINION

to any of his symptoms."  PRF 590.

Dr. Cohen examined plaintiff in February 1993.  Plaintiff later admitted that he secretly taped the examination.  Dr. Cohen diagnosed panic disorder with mild agoraphobia, and mixed personality disorder with narcissistic and schizotypal traits.  She stated that plaintiff's panic attacks might be "the outward manifestation of an intense psychotic anxiety that could be overwhelming if not expressed in a way that [plaintiff] and his family can consider as an innocuous 'biological' problem."  PRF 649.

Dr. Cohen stated that plaintiff had not attempted either supportive psychotherapy, which she thought could be helpful without threatening his mental stability, or higher doses of Xanax.  She noted that although plaintiff was taking only about 1.5 mg of Xanax per day, doses as high as 6 to 8 mg are often prescribed for panic attacks.

In July 1995, plaintiff was driving a jet ski on a lake when another jet ski collided with him.  Plaintiff suffered a broken pelvis.

In 1995, plaintiff began seeing Dr. Daniel M. Glick, a psychiatrist.  In a March 1996 progress report, Dr. Glick noted that plaintiff was going through a difficult divorce.  Plaintiff was taking Anafranil, a drug that seemed to help with the panic attacks.  Dr. Glick stated that plaintiff's condition prevented

him from returning to work because of "phobia of work performance problems."  PRF 858.  Dr. Glick stated that plaintiff's condition "appears to be chronic but shows some mild improvement."  Id. Dr. Glick stated it was "unknown" when plaintiff could resume work.  Dr. Glick found a current GAF score of 60, and a high score during the previous year of 75.  A GAF score between 51 and 60 indicates moderate symptoms, such as occasional panic attacks, while a score from 71 to 80 indicates transient reactions to normal stress, with only a slight impairment of functioning.

Defendant considered the high GAF scores to conflict with the finding of total disability, so it requested clarification from Dr. Glick.  At first Dr. Glick was reluctant, but in June 1996 he agreed to speak with Mary-Alice Swanson, an employee of defendant.  Dr. Glick considered plaintiff to be totally disabled because his symptoms worsened during the divorce process.  Dr. Glick never spoke with plaintiff about vocational rehabilitation or plaintiff's personal life because Dr. Glick was "not his therapist."  PRF 922.  Dr. Glick said he was "not doing therapy just medication management."  Id.  Dr. Glick would not explain whether the relatively high GAF scores indicated that plaintiff could return to work.

While trying to obtain custody of plaintiff's children in the divorce proceedings, plaintiff's attorney filed a document stating that plaintiff was unemployed but denied "any mental

11 - OPINION

disability whatsoever." PRF 891. Plaintiff explains that this document was filed by an incompetent attorney, and that it was not accurate. I find that the document is not relevant here.

I also find that plaintiff's designation as a statutory agent for a friend's out-of-state construction company is not relevant here. I agree with plaintiff that an agreement to act as an agent for service of process is not employment for purposes of the disability policy.

Defendant hired a private investigator to monitor plaintiff's daily activities for five days in March 1996. The investigator found that plaintiff led fairly active life, going out for breakfast with a man and several women on four of the five days. Plaintiff was away from his apartment, where he had moved during the divorce, about half of each day, doing various errands.

As of April 28, 1997, defendant concluded that plaintiff was not totally disabled under the policy and stopped paying benefits. Defendant's letter to plaintiff stated that plaintiff had failed to submit copies of "financial information" despite repeated requests starting in June 1996. In light of plaintiff's failure to respond, defendant stated that "we assume you no longer wish to pursue this claim and have closed our handling of your file." Defendant's letter stated that "it also appears from the most recent Progress Report that you are not treating often

with your doctor.  The most recent Progress Report received is unacceptable.  The doctor's portion was a photocopy, not an original.  We require original monthly reports."  PRF 972.  The April 1997 report was simply a copy of the March 1997 progress report, with only the addition of the words "Monthly/BiMonthly today 4/4/97," and the words "to guarded" added to the prognosis of "fair."  Compare PRF 952 (March 1997 report) with PRF 969 (April 1997 report).  The record indicates that plaintiff sought medical help only to maintain his medications and his disability benefits.  The record here does not show that plaintiff was seeking to treat his illness so that he could return to work.

In addition to the record that was before defendant when it decided to deny benefits, I have also considered evidence that was not in the record because the evidence sheds light on whether plaintiff was disabled as of April 28, 1997.

The declarations of plaintiff's parents, his wife, and a friend emphasize plaintiff's sincerity and describe him as being disabled by the panic attacks despite his willingness to return to work.  In his own deposition, plaintiff describes his struggles with panic attacks and indicated his belief that the panic attacks have a physical cause, such as a chemical imbalance, rather than stemming from emotional problems.

I do not find persuasive the 2001 expert report of psychologist Dr. C. Brady Wilson, which was submitted by

13 - OPINION

plaintiff. Dr. Wilson reviewed plaintiff's medical records but did not personally examine him.

I do find persuasive the 1999 follow-up reports of Dr. Cohen, the psychiatrist, and Dr. Cheifetz, the psychologist. Drs. Cohen and Cheifetz had an excellent opportunity to evaluate plaintiff because they examined him both before and after the denial of benefits.

Dr. Cohen examined plaintiff for the second time on August 1999. Plaintiff told Dr. Cohen that his illness had not changed much since their first meeting in March 1993, although he no longer went to hospital emergency rooms often. Plaintiff refused to believe that the panic attacks indicated an anxiety disorder rather than a physical illness. He saw Dr. Glick less than once a month, and was not receiving psychotherapy.

Dr. Cohen agreed with a diagnosis of panic disorder, although she noted "this is based entirely upon [plaintiff's] self report." App. to Pltf.'s Br., Ex. 9, at 5. Dr. Cohen also diagnosed hypochondriasis, a preoccupation with fears of having a serious disease, that persisted despite medical evaluation and reassurance. Dr. Cohen rejected diagnoses of obsessive compulsive disorder and agoraphobia.

Dr. Cohen did not think that plaintiff was receiving adequate treatment for his anxiety disorder. She thought that Dr. Glick should have tried other medications and possibly

psychotherapy or hypnosis, in light of plaintiff's continuing anxiety attacks. Dr. Cohen concluded:

> Despite his ongoing problems with anxiety and somatic preoccupations, it is not clear to me that [plaintiff] is totally disabled from doing his previous sort of work. . . . From his description of his activities [helping to plan a new house], it seems to me he may already be performing many of these tasks. Whether he could work steadily or not may be a matter of motivation to a great degree.

Id.

Dr. Cheifetz met with plaintiff on July 15, 1999. She administered several psychological tests, but plaintiff left many questions unanswered, and there were indications that he exaggerated his symptoms. Plaintiff therefore took the tests again on October 5, 1999. Dr. Cheifetz noted that when she tried to make an encouraging statement that treatment could help plaintiff, plaintiff became angry and took the comment as an accusation.

Dr. Cheifetz agreed with the diagnosis of panic disorder, although, like Dr. Cohen, she noted that the diagnosis was based entirely on plaintiff's own statements. Dr. Cheifetz thought that plaintiff's failure to seek treatment other than medication indicated that he "may, in fact, be fearful of resuming his work status. When people are away from a position of responsibility and off work for a long time, they often lose confidence in their ability to function competently and independently." App. to

15 - OPINION

Pltf.'s Br., Ex. 10, at 7. Dr. Cheifetz noted that plaintiff's 1993 test results indicated "a real self-concern" about his symptoms, while the 1999 test results showed "an exaggeration" of his symptoms. Id. Dr. Cheifetz saw this as a sign that "secondary gain" was involved. Dr. Cheifetz found that the test results did not indicate that plaintiff was "totally disabled from doing his previous sort of work." Id. In accord with Dr. Cohen, Dr. Cheifetz saw plaintiff's efforts to plan the remodeling of a house as a sign that he retained the ability to make decisions. Dr. Cheifetz also noted that plaintiff was found capable of caring for minor children. She concluded, "I feel that [plaintiff] could reasonably resume his work if he would wish to do so. Additionally, he would likely seek any and all forms of treatment in an effort to assist himself if he did begin to experience anxiety or panic along the way, if he was motivated to do so." Id. at 8.

Defendant submits the June 2005 report of David McDowell, a psychologist, who is senior medical director for defendant's parent company. Dr. McDowell reviewed plaintiff's medical records, and concluded that as of April 1997, plaintiff was capable of working full-time at his former occupation. Dr. McDowell noted the relatively high GAF scores; the surveillance reports indicating that plaintiff was leading an active life inconsistent with total disability; and the infrequent and

16 - OPINION

minimal medical care plaintiff had received.  Dr. McDowell concluded that plaintiff's "activity level and specific activities were highly inconsistent with disabling levels of panic disorder, anxiety disorder, or 'obsessive-compulsive spectrum disorder.'"  PRF, Ex. C, at 3.  Dr. McDowell noted, as did Dr. Cheifetz, that plaintiff's narcissistic and histrionic personality, while giving him a stubborn and stable quality, also made it difficult for him to be treated effectively.

## DISCUSSION

The issue is whether plaintiff has shown that he was totally disabled as of April 1997.  Under the policy, "total disability"

means that because of Injury or Sickness:

a.  You are unable to perform the important duties of Your Occupation; and

b.  You are not engaged in any other gainful occupation; and

c.  You are under the regular and personal care of a Physician.

In determining whether an insurer properly denied benefits, the court reviews the record that was before the insurer while acting as the plan administrator.  See Kearney v. Standard Ins. Co., 175 F.3d 1084, 1094-95 & nn.4-5 (9th Cir. 1999) (en banc) (opinion of Kleinfeld, J.).  My review of defendant's decision is de novo, rather than for abuse of discretion, because defendant's policy does not give defendant discretion in awarding disability benefits.  See Thomas v. Oregon Fruit Prods. Co., 228 F.3d 991,

17 - OPINION

994 (9th Cir. 2000).

When reviewing a denial of benefits de novo, "the district court [may] conduct a much broader review [than under the abuse of discretion standard], considering anew both the legal and factual aspects of [the plaintiff's] claim." Id. at 995. On de novo review, the court may, if necessary, consider evidence not in the administrative record "to enable full exercise of informed and independent judgment." Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan, 46 F.3d 938, 943 (9th Cir. 1995). Plaintiff has the burden of proof to show disability. See Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 525 (1st Cir.), cert. denied, 2005 WL 2493925, 74 U.S.L.W. 3108 (U.S. Oct. 11, 2005) (No. 05-189).

**I.   "[U]nable to perform the important duties of Your Occupation"**

Reviewing the evidence de novo, I agree with defendant that plaintiff has not shown that he was "unable to perform the important duties of [his] Occupation." Assuming that plaintiff subjectively believes that he is totally disabled by panic attacks, his daily activities and the medical reports indicate that plaintiff retains the ability to work full-time at his former occupation. The GAF scores from plaintiff's own physicians indicate the ability to work with only slight impairment. The reports of Drs. Cohen and Cheifetz are particularly persuasive regarding plaintiff's condition.

18 - OPINION

Plaintiff argues that if he returned to work, he would not be allowed to leave whenever he felt the onset of a panic attack. I find this argument insufficient to overcome the countervailing evidence that plaintiff would be able to return to work.

## II.  "[U]nder the regular and personal care of a Physician"

Defendant also contends that the denial of benefits was justified because plaintiff did not satisfy the policy's requirement that he remain "under the regular and personal care of a Physician."  Dr. Bryman, plaintiff's own treating physician, advised plaintiff to seek psychological treatment.  Drs. Cohen and Cheifetz stated that psychotherapy and other non-drug treatments have been effective in allowing persons with panic disorders to live reasonably normal lives.  In addition, there are prescription drugs available to treat the disorder.  During the relevant time, however, plaintiff did not seek more effective treatment.  Dr. Glick, a psychiatrist, did little more than renew plaintiff's prescriptions.

Plaintiff points out that defendant's disability policies now require that the insured seek "appropriate" care.  Plaintiff argues that defendant is attempting in effect to retroactively amend the disability policy it issued to plaintiff.  However, plaintiff failed to seek more effective treatment, despite medical advice.  Under these circumstances, I conclude that plaintiff's minimal treatment with Dr. Glick, apparently less

19 - OPINION

than once a month, does not satisfy the policy's requirement that the insured seek regular and personal care from a physician. This provision inherently includes the requirement that the treatment sought be effective, if, as here, effective treatments are reasonably available.

## CONCLUSION

Judgment is for defendant. Any pending motions are denied as moot.

DATED this 25th day of October, 2005.

<u>/s/ Owen M. Panner</u>
OWEN M. PANNER
U.S. DISTRICT JUDGE